UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TOWER RESEARCH CAPITAL LLC, | No. 18-CV-3453 (AT) |
| *Plaintiff*, | |
| v. | **AMENDED COMPLAINT** |
| ALAAP PARIKH, | **JURY TRIAL DEMANDED** |
| *Defendant*. | |

## NATURE OF THE ACTION

1.      Tower Research Capital LLC ("Tower") brings this action for misappropriation of trade secrets and breach of contract against former employee, defendant Alaap Parikh, to redress and prevent the dissemination of highly valuable trade secrets concerning Tower's confidential and proprietary trading strategies.

2.      In the week leading up to his March 7, 2018 notice of resignation, Parikh engaged in highly unusual and unprecedented behavior on the Tower network, spending extended periods across several late nights and days he was not in the office logging into his work computer from home and browsing, searching for, and reviewing a substantial volume of highly valuable and proprietary Tower trading-strategy documents, including core sensitive trading execution algorithms and predictive signals, configurations, and source code.

3.      This week-long exploration was highly unusual for Parikh, who in the past had logged onto the Tower network from outside the office only to work on models for which he had responsibility.  Parikh's particular actions on the network during the week before his resignation were also highly unusual.  When he was in the office, Parikh accessed files pertinent to his responsibilities as a fixed-income trader.  But during the after-hours and other non-office

network sessions preceding his notice of resignation, Parikh searched for, accessed, and rifled through confidential files concerning trading strategies for which he had no responsibility, on which he had never worked, and which he had never viewed during his time at Tower. The number of such files Parikh accessed and viewed during this time period were substantial, and Parikh usually spent less than a minute (and sometimes only a handful of seconds) on each, an amount of time insufficient to meaningfully review or study the files and source code in real time.

4.      The only plausible explanation for Parikh's suspicious activity is that he was copying Tower's trade secrets, in violation of federal and state law and in breach of his employment agreement with Tower. When Tower confronted Parikh the first week of April, after having discovered Parikh's network activity, Parikh offered shifting explanations. He first claimed he had viewed the files in an attempt to discover advantages for the fixed-income trading for which he was responsible. He then quickly shifted to a different excuse, however, saying he reviewed the files to learn more about Tower's various trading strategies in an effort to enhance his knowledge and value in the future after his departure from Tower.

5.      Neither of Parikh's excuses made sense, however. With respect to his initial claim, this searching occurred immediately prior to his notice to Tower that he intended to resign —a development which is fundamentally inconsistent with the idea that he was studying these files with an eye towards future fixed-income trading at Tower. With respect to his second claim, this too makes no sense: most of the files he reviewed are long and complex, and would require careful and extended study to understand and digest. Furthermore, Parikh claimed in this same meeting that he had no intention of working in the industry in the future, an assertion that

runs directly contrary to his claimed interest in better understanding this code for future knowledge.

6.      The only explanation is much simpler, and corroborated by the length of time that he reviewed these files: Parikh was copying in some fashion—likely by taking photographs— the sensitive trading code for future study and use.

7.      Tower already had grave concerns about Parikh's bizarre conduct and his shifting excuses, particularly given the plans Parikh shared with co-employees in March that he intended to leave the United States in April and spend six months in Indonesia. While Tower counsel understood that Parikh would remain in the country until the issues raised here were addressed, Tower's concerns have now only strengthened, having learned today, April 19, 2018, that he has already left the country. Taken together, the unusual facts suggest one conclusion: Parikh has violated and will continue to violate federal (and state) law and his employment agreement by misappropriating Tower's trade secrets.

8.      The confidential files Parikh reviewed reveal key trading strategies of one of Tower's most lucrative trading teams. If the information in those files were disseminated or otherwise disclosed by Parikh outside Tower, or used by Parikh, it would cause substantial and irreparable injury to Tower.

9.      Tower brings this action (a) to prevent Parikh from further misappropriating Tower's trade secrets or disseminating them; (b) to secure access to, and to obtain a forensic examination of, Parikh's electronic devices before evidence of misappropriation can be deleted and before Parikh can disseminate Tower's confidential information from those devices; and (c) for damages for Parikh's misappropriation.

## THE PARTIES

10.     Plaintiff Tower Research Capital LLC is financial services firm, headquartered at 377 Broadway, New York, New York, 10013.

11.     Tower's operations span markets across the globe, and Tower is engaged in interstate commerce.

12.     Defendant Alaap Parikh was, at the time of the events in question, a resident of New York.  Parikh was an employee at Tower from December 10, 2015 until April 6, 2018.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 1367.

14.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted herein occurred in the Southern District of New York.

15.     Pursuant to the employment agreement entered into by and between Tower and Parikh, dated December 10, 2015, the parties agreed to submit to personal jurisdiction in state and federal courts sitting in New York County.

## GENERAL ALLEGATIONS

### A.     Tower and Its Confidential Trading Strategies

16.     Tower is a proprietary trading firm.  Through approximately 30 separate trading teams, Tower trades in various types of asset classes and geographic regions around the world.

17.     Tower's trading strategies and technology are founded on, among other things, innovative trading execution algorithms and predictive signals, mathematical and valuation models, source code, infrastructure design, software, and computer network and hardware configurations.  This confidential and proprietary information and technology is developed within Tower's trading teams and other departments.  Tower's trading strategies and technology

4

seek to benefit from the intelligent processing of market information, efficient market access, and rapid reactions to changes in the markets. Tower's confidential and proprietary information and technology—including its algorithms, source code, and models—give Tower a competitive advantage in predicting future prices and executing the most profitable trades as quickly as possible. As such, it constitutes highly valuable intellectual property.

18.     To succeed, it is imperative that the confidentiality of Tower's trading strategies, including algorithms and source code, technology, and related information be maintained. Knowledge of such information, or the use or execution of the same or similar strategies or technology, by others in the market would disrupt the success of Tower's trading. If this information or technology were disseminated or otherwise disclosed, it would cause substantial and irreparable injury to Tower—compromising Tower's highly valuable trading strategies and technology by making them known to competitors or others who would use them.

19.     For that reason, Tower takes significant measures to keep its proprietary information and technology—including its trading strategies and techniques, models, algorithms, and source code—secret and confidential. For example, Tower employees are subject to rigorous confidentiality and non-compete covenants in their employment agreements, and each Tower trading team is walled off from other trading teams, unable to access those teams' strategies and code. Other security measures by which the source code is kept secret include the issuance of internal compliance manuals, policies, and compliance bulletins reminding employees to protect the confidentiality of Tower's proprietary information, including its trade secrets, and warning that unauthorized use or distribution of such information would violate Firm policy and possibly the law.

**B.    Defendant Alaap Parikh, His Tower Employment, and His Announced Departure From Tower**

20.    Defendant Parikh commenced employment with Tower on December 10, 2015.

21.    During his over-two-year tenure, Parikh was part of Tower's Limestone trading team.  The Limestone team, one of the firm's most profitable, focuses on high-frequency algorithmic trading of various asset classes in over 100 different market across the world.  Parikh worked exclusively on fixed-income trading, primarily in U.S. government bonds and global interest rate futures.  In his fixed-income role on the Limestone team, Parikh, among other things, developed statistical models based on market research and wrote code to translate those models into profitable trading programs.

22.    Upon commencing employment with Tower, Parikh signed an Employment, Confidentiality & Non-Competition Agreement with Tower (the "Agreement").

23.    Sections 7 and 8 of the Agreement, among others, survive termination (pursuant to Section 17 of the Agreement).  Section 7 of the Agreement, containing Parikh's confidentiality and non-disclosure obligations, defines Tower's "Confidential Information" to include, among other things, "technological methods, practices, and information," "computer software or data of any sort," and "computational algorithms, procedures, methods, or techniques developed by Tower or the essential ideas and principles underlying such algorithms, procedures, methods, or techniques."  Section 7 prohibits the "use of [Confidential Information] other than for Tower's express purposes," and contains an express covenant not to "copy, photograph, duplicate, draw, sketch, download, upload, alter, destroy, replicate, transmit, mail, or otherwise convey any Confidential Information belonging to Tower nor remove the same from Tower's office premises or property."

24.     Tower elected to exercise its contractual right to hold Parikh to his contractual non-compete covenants (under Section 8 of the Agreement) on a paid basis for twelve months following his last day of work.

25.     Tower paid Parikh his annual bonus on Wednesday, February 28, 2018.

26.     One week later, on Wednesday, March 7, 2018, Parikh tendered a notice of resignation.  At Parikh's request, Tower agreed to shorten the standard sixty-day notice period to thirty days, making his last day Friday, April 6, 2018.

27.     Tower delivered an exit letter to Parikh on Monday, March 26, 2018, reminding Parikh of the confidentiality and non-compete obligations that survive his resignation.  The letter further confirmed that his last day would be April 6, 2018, and that Tower had elected to enforce a twelve-month non-compete period through April 6, 2019.

28.     In the weeks leading up to his departure, Parikh shared his post-Tower plans with coworkers, saying that he planned to surf in Indonesia for the next six months, since he could not work in the industry due to the non-compete covenants in the Agreement.  He told coworkers that he would depart the country as soon as he finished at Tower, and would stay with a friend during his final week of employment, after giving up his New York apartment.

C.      **Tower's Discovery of Parikh's Suspicious Activity**

29.     As part of its traditional offboarding process, Tower routinely reviews the recent work history of departing employees.

30.     Parikh's immediate supervisor, Pranay Jain, performed an initial review of Parikh's recent work history on Monday, April 2, 2018.  Jain discovered that, on the immediately preceding weekend, specifically at approximately 11:30 pm on Sunday, April 1, 2018, Parikh had logged onto the network from home and conducted an irregular review of the files of another Limestone trader.  That review included confidential documents containing trading strategies,

techniques, and related information for trading strategies on which Parikh did not work and for which he had no responsibility. Parikh's activities—searching for and accessing confidential files that had nothing to do with the fixed-income strategies for which he was responsible, doing so from home late at night on a weekend, and doing so on the eve of his final week at Tower— raised suspicions. Jain accordingly shared his discovery with his supervisors.

31.    As a result of Jain's discovery, Tower quickly launched a broader review of the last six months of Parikh's actions—specifically, logs containing every command that Parikh entered on Tower's systems dating back to October 5, 2017.

32.    What Tower found was shocking: after months of routinely conducting work related to his responsibilities as a fixed-income trader, almost always from the office, Parikh's behavior changed abruptly the week before he gave his notice of resignation.

33.    After receiving his bonus on February 28, and for the following week leading up to his March 7 resignation notice, Parikh began logging in regularly from home late at night and on other days he was not in the office, and during such sessions, searching for and accessing the Limestone team's most confidential trading-strategy documents, including core sensitive trading execution algorithms and predictive signals, configurations, and source code. To make things worse, the documents Parikh reviewed were unrelated to the fixed-income trading strategies on which he worked and for which he had responsibility. Odder and more troubling still, Parikh did not appear to have studied the files in detail—rather, he rapidly accessed a large volume of confidential files at per-document rates (identifiable in the logs) that make it inconceivable he was doing anything other than copying the contents of the files—likely via some sort of electronic or manual recording device to capture images or copy text of Tower's most precious trade secrets.

34.     Parikh knew his conduct was wrongful, so he could not do it in front of his colleagues at work.  Parikh sat next to his direct supervisors and used large computer monitors, so his activity would have been visible at all times.  Parikh's supervisors would have immediately known that Parikh's conduct was unauthorized, which is the reason Parikh engaged in his improper conduct exclusively from outside the office.

35.     In more specific detail, Parikh's activities that week proceeded as follows.

36.     On the evening of Wednesday, February 28, 2018, Parikh logged onto Tower's system from home at 11:07 pm, engaging in the first network activity raising suspicions.  After opening certain files containing confidential documents that were relevant to Parikh's fixed-income team, Parikh then changed his focus, browsing through confidential folders, directories, and files—including files that contained source code—related to the Limestone team's trading strategies and techniques that spanned a range of several different asset classes (e.g., equities, options, futures) and geographic regions on which he had never worked and for which he had no responsibility.  Parikh logged off at 12:15 am on March 1, 2018.

37.     After leaving work around 6:30 pm on Friday, March 2, 2018, Parikh again logged in from home at 9:21 pm, remaining on the network for approximately three hours, and logging off at 12:16 am.  During this session, Parikh browsed—as well as ran targeted searches for particular keywords leading to—confidential files containing source code, configurations, designs and related information in connection with the Limestone team's trading strategies and techniques far outside his area of responsibility.  Parikh would not have needed to conduct searches for such files if he previously knew about or worked on them, or had he simply asked other team members to identify them for some legitimate purpose.  During his network session that night, Parikh searched for and opened dozens of files containing a substantial amount of

confidential source code in a plain text editor, often for no more than one minute at a time, again concerning areas outside the trading strategies on which he worked.

38.　　Parikh again logged on from home on Saturday, March 3, 2018, this time at 11:06 am, spending over two hours systematically proceeding through source-code files for fixed-income trading strategies, usually spending less than a minute on each file.  He logged off at 1:23 pm.  Later that afternoon at 5:46 pm, he logged back on and performed a search for files related to a particular fixed-income trading strategy that one of Parikh's teammates, not Parikh, had worked on—a strategy for which Parikh had no responsibility.  It took Parikh only eleven minutes to capture whatever he needed from his teammate's work, and he logged off at 6:03 pm.

39.　　The next day, Sunday, March 4, 2018, Parikh logged in at 12 noon and spent the next five hours repeating his surreptitious review of some of the most sensitive trading-strategy documents belonging to the Limestone team, again concerning trading strategies on which Parikh did not work and for which he had no responsibility.  After taking a break at 5:09 pm, Parikh logged back in at 11:19 pm that night and continued where he left off, digging around in other sensitive directories and files for lucrative trading strategies.  This continued until 3:15 am.  During the late-night/early-morning session, Parikh accessed and reviewed core, sensitive, trading-strategy source code and browsed the files of an overseas employee with whom Parikh had never worked.

40.　　Parikh did not come into Tower's offices or log on from home during the day on Monday, March 5, 2018.  That night, however, he signed back on at 8:41 pm, picking up where he left off by accessing confidential files for trading strategies on which he had never worked, logging off at 9:02 pm.  After midnight (so now March 6), at 12:26 am, Parikh restarted his accessing and reviewing of files until 2:03 am.  During that time, Parikh accessed even more

highly confidential files, including source code, again typically spending less than a minute on each file.

41.     Parikh again did not come into Tower's offices or log in from home during the day on Tuesday, March 6, 2018.  But later that evening he logged in from home again, from 8:41 pm to 12:16 am, again accessing and reviewing files regarding trading strategies on which he had not worked and for which he had no responsibility.

42.     The following day, Parikh reported for work and tendered his resignation notice to Tower.  Upon making Tower aware of his plans to leave, Parikh's suspicious after-hours activity ceased for the next three weeks.

43.     As noted, however, on Sunday, April 1, 2018, on the eve of his last week with the firm, Parikh logged on from home one last time, this time at 11:19 pm, and continued the activities from the week of February 28-March 6, arousing his supervisor's suspicions, and ultimately leading to the discovery of the activities described above.

### D.     Tower Meets With Parikh

44.     On the afternoon of April 3, 2018, Jain, Taranbir Singh (Jain's supervisor and a Tower partner), and Rakesh Grawal (another partner), met with Parikh to speak with him about his suspicious, surreptitious, late-night activities.

45.     Jain, Singh, and Grawal informed Parikh that they had discovered disturbing activity during a search of his logs, and showed him some examples.  Parikh admitted that his conduct was unusual.

46.     Parikh first responded that he accessed the files to determine whether there were ideas that could help in his fixed income work.  After Singh expressed doubt about that story, given that Parikh had never done this kind of after-hours "research" from home before, and did so only on the eve of announcing his resignation, Parikh then changed his story, admitting that he

was trying to learn as much as possible before he resigned to enhance his future value. Though he denied copying anything, Parikh had no explanation when pressed for how he could have possibly derived any knowledge by spending a mere minute or less on text files containing hundreds of lines of complex text.

47.    In denying stealing, Parikh invited Tower to search his personal devices and offered to sign a non-compete agreement, stating he had no intent to work in the industry anymore. Singh and his colleagues left briefly to discuss Parikh's offers, but by the time they returned, Parikh changed his mind, withdrew his offer to have his personal devices searched, and stated that he would retain a lawyer. Tower allowed Parikh to leave work and contact a lawyer and since then has communicated with Parikh only through his lawyer.

**E.    Parikh Refuses Tower's Urgent and Reasonable Preservation and Examination Request**

48.    Since Wednesday, April 4, counsel for Tower has attempted to negotiate access to Parikh's personal devices to confirm that no Tower confidential information is contained on the devices, was disseminated from the devices, or was deleted from the devices. In engaging in these negotiations, Tower counsel was told that Parikh did not intend to leave the country until this issue was resolved. On April 19, 2018, Tower counsel learned that Parikh had in fact left the country.

**F.    Parikh Submits a Declaration**

49.    Parikh submitted a declaration to this Court on April 26, 2018. ECF No. 15.

50.    Parikh's attestations in his declaration in fact support the conclusion that he copied Tower's trade secrets.

51.    First, Parikh's declaration confirms that his first explanation for his 21-hour, stealth, search-and-access campaign was a lie. While Parikh originally told Jain, Singh, and

Grawal that he accessed Tower's trade secrets to help his fixed income work at Tower, he now testifies through his declaration that he accessed Tower's trade secrets, unrelated to his own work, "out of intellectual curiosity and to see how predictor models specific to asset classes other th[an] fixed income . . . function" (¶ 10).

52. Second, Parikh's further attestations in his declaration then undermine even this attempt at exculpation. While claiming that the purpose of his 21-hour campaign was the intellectual study of how Tower's predictor models work outside fixed income, and while acknowledging that the files he accessed "contain thousands of lines of computer code, [and] concern multiple inputs, variables and correlations" (¶ 14), he then testified that he merely "glanced" at the files (¶ 15).

53. The files that Parikh viewed *are* complex. The files use anywhere from 20 to more than 100 different variables, in which the output of one variable may depend on how the code employs a different variable. As a result, as Singh testified, one could not understand what Tower's price predictors are doing by studying only one small piece of the code. Rather, it would take hours, and in some cases days, to understand how a price predictor worked. No "intellectual curiosity" could be satisfied without studying, digesting, and understanding thousands of interdependent lines of code.

54. Parikh's assertions that he conducted his week-long search and access to study Tower's price predictors, but that he only glanced at the files, together make sense only if he was copying the files—"quickly searching for specific terms that would help me determine if the file was of interest to [him]" (¶ 13) and then copying the code, either through photographs or copy-paste methods, for later study.

55.     That conclusion is also supported by Parikh's second admission upon meeting with Jain, Singh, and Grawal on April 3—i.e., that he conducted this campaign to enhance his future value.  To do so would have required more than simply glancing at small excerpts of complex, multi-variable, price predictor files.  It would have required copying.

### G.     Tower Faces Imminent Irreparable Injury

56.     Based on the facts alleged above, Parikh has copied and potentially transmitted Tower's most proprietary trading strategies documents, including algorithms, models, research, and source code.  Irreparable harm has therefore already likely occurred.  Given the nature of the trade secrets, and Parikh's behavior and international travel, further irreparable harm is imminent.

57.     If the confidential and proprietary trading-strategy documents that Parikh accessed, including core sensitive source code, were used or disseminated, Tower would be irreparably injured.  The trading strategies are used by one of Tower's most profitable trading teams and their value derives from, among other things, its confidentiality.  If others engaged in the same trading, or were to learn Tower's trading strategies or employ them, Tower's trading strategies would not succeed, compromising not simply the benefit of the strategies but also the substantial work that went into identifying and refining them.

58.     This loss of Tower's competitive position would be especially acute by virtue of the nature of algorithmic high-frequency trading.  As a firm with a quantitative focus, Tower's algorithms and source code are among its critical differentiators.  Tower's competitive position is based on the quality and development of its price prediction and execution signals.  Tower competes in a highly specialized, highly competitive space in which the development of technological edges gives Tower competitive advantages that can result in gains or losses of millions of dollars annually.  Accordingly, should one of Tower's (equally specialized)

14

competitors gain knowledge of or access to Tower's trade strategies and algorithms, the value created by Tower's years of designing, developing, and refining these trade secrets would dissipate almost instantly.

59.     Because Tower may never know precisely who Parikh has shared, or will share, Tower's trade secrets with, or how Parikh or those persons may integrate those secrets into own trading strategies, the injury absent injunctive relief will be irreparable, as it will be impossible to redress accurately such indeterminate, pervasive, and potentially long-lasting damage to Tower's competitive position.

60.     Tower also will face enormous challenges in calculating how discrete uses and disclosures of Tower's Confidential Information has destroyed or will destroy Tower's competitive position.  Parikh accessed a vast amount of Tower's Confidential Information that varies along multiple dimensions—including variations across asset classes, geographies, price signal and execution strategies, and software functions.  Especially given the anonymity inherent in the trading at issue, it would be nearly impossible for Tower to calculate damages from the piecemeal, wholesale, or even multiple disclosures or uses of this information.

61.     Parikh's own admissions make it likely that such dissemination has occurred or will occur.  Parikh stated that the purpose of his conduct was to enhance his future value, which would only be possible through further use of the information.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Defend Trade Secrets Act, 18 U.S.C. § 1836)

62.     Plaintiff repeats and re-alleges the preceding and subsequent paragraphs as though fully set forth herein.

63.     The Defend Trade Secrets Act (the "DTSA") provides a federal private right of action for "[a]n owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1).  It authorizes courts "to grant an injunction" to "prevent any actual or threatened misappropriation," including by "requiring affirmative actions . . . to protect the trade secret." *Id.* § 1836(b)(3)(A)(i)-(ii).

64.     Under the DTSA, "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information, including . . . formulas, . . . methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored," if (A) the trade-secret owner "has taken reasonable measures to keep such information secret," and (B) "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3).

65.     The confidential Tower trading-strategy documents ("Tower's Confidential Information"), including sensitive source code, constitute "trade secrets" under the DTSA.

66.     Tower's Confidential Information, including its trade strategies, algorithms, and source code, comprises financial, business, and economic information that Tower has taken reasonable measures to keep secret and which derives independent economic value from not being generally known to or being readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information.  Tower's entire business depends on developing smarter quantitative strategies and better algorithms than its

competitors in the market. The confidentiality of Tower's strategies, algorithms, and code is thus a fundamentally necessary condition of the success of Tower's business model.

67. Tower's Confidential Information, including sensitive source code, is "related to a product or service used in, or intended for use in, interstate or foreign commerce," as it concerns Tower's trading in national and international markets.

68. "Misappropriation" under the DTSA includes "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." 18 U.S.C. § 1839(5)(A). "Improper means" under the DTSA includes "breach . . . of a duty to maintain secrecy." 18 U.S.C. § 1839(6).

69. Parikh violated the DTSA by acquiring Tower's trade secrets through use of improper means, including through the violation of the Agreement's prohibition on copying Tower's confidential information; and, by his own admission, through his review of Tower's Confidential Information outside his area of responsibility for an unauthorized reason, specifically to enhance his knowledge and value outside of Tower in the future.

70. Parikh has already admitted to improper acquisition when he swore under oath that he accessed Tower's Confidential Information for the purpose of enhancing his future value, not to benefit Tower.

71. On information and belief, Parikh has already copied Tower's Confidential Information, which constitutes further acquisition by improper means. There is no other plausible explanation for the totality of Parikh's conduct, including but not limited to the fact that he conducted all his of improper accessing outside the office, that his improper access took place in the week leading up to his resignation, and that he proceeded in rapid progression through

complex files, spending mere seconds or minutes per-file, such that he could not have possibly extracted anything of value from those files without copying them.

72.     On information and belief, Parikh has already used or disseminated Tower's Confidential Information, or is threatening to do so:

      a.  Parikh admitted that in the week leading up to his resignation, he accessed Tower's Confidential Information to enhance his own value, see how predictor models unrelated to his work function, and search for specific information that was of interest to him.

      b.  There is no value to Parikh in Tower's Confidential Information other than use or dissemination.  Expending 21 hours accessing Tower's Confidential Information without use or dissemination of that information would be an entirely pointless exercise.

73.     As a direct and proximate result of these wrongful actions, Tower has sustained and continues to sustain economic injury for which it is entitled to monetary compensation.

74.     Tower is also entitled to the return of all confidential information wrongfully taken by Parikh, including Tower's Confidential Information, as well as an injunction to prevent dissemination of the information.

75.     Tower faces imminent, irreparable harm from Parikh's misappropriation of Tower's Confidential Information, trading-strategy documents, source code, and the material contained therein.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract)

76.     Plaintiff repeats and re-alleges the preceding and subsequent paragraphs as though fully set forth herein.

77.     The Agreement is valid and enforceable under New York law.

78.     Tower has performed all of its obligations under the Agreement.

79.     Section 7 survives termination of the Agreement pursuant to Section 17.  Section 7 prohibits the "use of [Tower's Confidential Information] other than for Tower's express purposes," and contains Parikh's covenant not to "copy, photograph, duplicate, draw, sketch, download, upload, alter, destroy, replicate, transmit, mail, or otherwise convey any Confidential Information belonging to Tower nor remove the same from Tower's office premises or property."

80.     Parikh breached Section 7 of the Agreement when he accessed Tower's Confidential Information, including trade strategies, algorithms, and source code, for purposes of increasing his own value to future prospective employees.  This was not a "use . . . for Tower's express purposes."

81.     Section 8 of the Agreement survives termination pursuant to Section 17.

82.     Tower elected to exercise its contractual right to hold Parikh to the non-compete covenants (set forth in Section 8 of the Agreement) for twelve months following his last day of work, in exchange for payment of Parikh's base salary.

83.     Section 8 prohibits Parikh for the next twelve months from "directly or indirectly, whether paid or unpaid . . . assisting any Tower Competitor."

84.     Parikh breached Section 8 when he accessed Tower's Confidential Information to increase his value to prospective employers (*i.e.*, "Tower Competitors" under Section 8(iii) of the Agreement).

85. Parikh further breached Section 8 when, on information and belief, he created copies of Tower's Confidential Information over which Tower could not maintain any secrecy or prevent such information from being used against Tower in the market.

86. As a direct and proximate result of these breaches, Tower has sustained and continues to sustain economic injury for which it is entitled to monetary compensation.

87. Tower is also entitled to the return of all confidential information wrongfully taken by Parikh, including Tower's Confidential Information, as well as an injunction to prevent dissemination of the information and enforce the confidentiality and non-compete covenants in the Agreement.

88. Tower faces imminent, irreparable harm from Parikh's prior and impending breaches of Sections 7 and Section 8 of the Agreement.

**THIRD CLAIM FOR RELIEF**
**(Misappropriation of Trade Secrets – New York Law)**

89. Plaintiff repeats and re-alleges the preceding and subsequent paragraphs as though fully set forth herein.

90. "To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d Cir. 1999).

91. "[A] trade secret is 'any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it.'" *Id.* at 44 (quoting *Softel, Inc. v. Dragon Med. & Scientific Comms., Inc.*, 118 F.3d 955, 968 (2d Cir. 1997)). "In determining

whether information constitutes a trade secret, New York courts have considered the following factors: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Id.* (quoting *Ashland Mgmt., Inc. v. Janien*, 82 N.Y.2d 395, 407 (1993)).

92.     Tower's Confidential Information, including Tower's trade strategies, algorithms, and source code, constitutes trade secrets under New York law because it includes formulas and text compilations that give Tower an advantage over competitors who do not know those secrets.

93.     Tower's Confidential Information is not known outside of Tower's business, and Tower trading teams are walled off from accessing every other trading team's confidential strategies and source code. Tower requires employees to sign stringent confidentiality and non-compete covenants as a condition of employment, and further issues internal compliance manual, policies, and bulletins on a regular basis that remind Tower employees about their confidentiality and non-compete covenants.

94.     Tower's Confidential Information, including its trade strategies, algorithms, and source code, would be extremely valuable to Tower's competitors and, if disclosed, would cause irreparable harm to Tower, because competitors would be able to predict and thus outflank Tower's strategies and trades. Tower's proprietary strategies and algorithms are extremely complex and the result of years' worth of intense research, development, and constant

refinement. Accordingly, none of Tower's competitors could easily acquire or duplicate Tower's Confidential Information.

95.     Parikh misappropriated Tower's Confidential Information by using that information "in breach of an agreement" and "as a result of discovery by improper means."

96.     Parikh's accessing of Tower's Confidential Information for non-Tower purposes was in breach of the Agreement's confidentiality and non-compete covenants, as well as internal company policies on confidentiality. Parikh discovered Tower's trade secrets through use of improper means, including through the violation of the Agreement's prohibition on copying Tower's confidential information; and, by his own admission, through his review of Tower's Confidential Information outside his area of responsibility for an unauthorized reason, specifically to enhance his knowledge and value outside of Tower in the future.

97.     On information and belief, Parikh has already copied Tower's Confidential Information, which constitutes further discovery by improper means. There is no other plausible explanation for the totality of Parikh's conduct, including but not limited to the fact that he conducted all his of improper accessing outside the office, that his improper access took place in the week leading up to his resignation, and that he proceeded in rapid progression through complex files, spending mere seconds or minutes per-file, such that he could not have possibly extracted anything of value from those files without copying them.

98.     On information and belief, Parikh has already used or disseminated Tower's Confidential Information, or is threatening to do so:

         a.  Parikh admitted that in the week leading up to his resignation, he accessed Tower's Confidential Information to enhance his own value, see how

predictor models unrelated to his work function, and search for specific information that was of interest to him.

    b.   There is no value to Parikh in Tower's Confidential Information other than use or dissemination. Expending 21 hours accessing Tower's Confidential Information without use or dissemination of that information would be an entirely pointless exercise.

99.    As a direct and proximate result of these wrongful actions, Tower has sustained and continues to sustain economic injury for which it is entitled to monetary compensation.

100.    Tower is also entitled to the return of all confidential information wrongfully taken by Parikh, including Tower's Confidential Information, as well as an injunction to prevent dissemination of the information.

101.    Tower faces imminent, irreparable harm from Parikh's misappropriation of Tower's Confidential Information, trading-strategy documents, source code, and the material contained therein.

## **PRAYER FOR RELIEF**

WHEREFORE, Tower respectfully requests the Court to enter judgment in its favor and against Parikh as follows:

(i)    Enjoin Parikh from using or otherwise disclosing Tower's proprietary, confidential, and trade secret information;

(ii)    Enjoin any destruction, deletion, transfer, copy, download or other form of reproduction or deletion of any of Tower's proprietary, confidential, and trade secret information in Parikh's possession, unless it is done under the supervision of Tower's third party forensic investigator;

(iii)    Account for any and all Tower proprietary, confidential, and trade secret information currently or previously in Parikh's possession and produce for immediate inspection and imaging all computers and other electronic devices belonging to or under control of, accessible to, or operated by Parikh, including but not limited to his laptop, iPhone, and iPad, and any other electronic devices capable of storing or delivering data;

(iv)    Direct Parikh to return any and all Tower proprietary, confidential, and trade secret information in its possession;

(v)    Award Tower damages in an amount to be determined at trial;

(vi)    Attorneys' fees and costs; and

(vii)    Such other and further relief as the Court deems just and proper.


## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.


Dated: July 5, 2018        WILMER CUTLER PICKERING
       New York, New York          HALE AND DORR LLP

                    By:    _/s/ Noah A. Levine_
                           Noah A. Levine
                           Daniel F. Schubert
                           Jack Zarin-Rosenfeld
                           7 World Trade Center
                           250 Greenwich Street
                           New York, New York 10002
                           Tel.: (212) 230-8800
                           Fax: (212) 230-8888
                           noah.levine@wilmerhale.com
                           daniel.schubert@wilmerhale.com
                           jack.zarin-rosenfeld@wilmerhale.com


                    *Attorneys for Plaintiff Tower Research Capital LLC*